## JOSÉ BEJARANO v. THE STATE.

1. PRACTICE. — A juror summoned on a special *venire* was excused by the court below because he had, on a previous occasion, made oath that he was not a citizen of the United States. The defendant took no objection to this action at the time, but assigned it as cause for new trial and as error. *Held*, that the objection should have been raised when the juror was excused, so that the court could then have had the juror sworn and again tested as to his qualifications.

2. SAME. — A juror in a capital case stated on his *voir dire* that he was neither a freeholder nor a householder, and that, though the head of a family, he and they lived with his father. But, on his entire statement, the court below held him, instead of his father, to be the householder, and ruled him to be a qualified juror. The defendant excepted to the ruling, and challenged the juror peremptorily. A full panel was obtained, however, before the defendant exhausted his peremptory challenges. *Held*, that, whether the juror was qualified or not, there was no error to the prejudice of the defendant.

3. MURDER — EVIDENCE. — It was not error to admit proof of what the deceased, in the presence of the accused, and while attempting to escape the latter's pursuit, said to a witness respecting the injury inflicted on him.

4. CONSTITUTIONAL LAW — TERMS OF DISTRICT COURT. — The act of May 30, 1876, providing that five terms of the District Court of Bexar County should be held, and specifying the times therefor, is not a "local or special law" in the sense used in the constitutional prohibition, but is an enactment within the constitutional power of the Legislature. See *Cordova* v. *The State, ante,* p. 207, on this question.

5. CHARGE OF THE COURT. — An instruction should be refused if inapplicable to the case, however correct it may be as an abstract proposition.

6. SAME. — Note evidence held sufficient to sustain a conviction for murder in the second degree, and affording no occasion to give in charge to the jury the law of manslaughter.

7. EXPLANATIONS given by the court below in elucidation of its rulings, and in verification of matters of fact, are commended as valuable aids in a revision of a cause upon appeal.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

The indictment, filed June 20, 1878, charged the appellant with the murder of Francisco Montero, in Bexar County, on June 10, 1878. Upon his trial, he was found guilty of murder in the second degree, and his punishment assessed at ninety-nine years in the penitentiary.

Ursula Castro was the first witness placed upon the stand by the State. She testified that, in the city of San Antonio, between the hours of seven and eight on the fatal night, while she was on her way home with her mother, and when she had reached the Rodriguez place, a point about three hundred yards below the property of Mr. Cocke and Mrs. Haffner, where the killing occurred, she saw an old man driving a cart, on which were riding an old and a young woman. Here a short, stout man came out from the chapparal and stopped the cart. He was very angry, and asked the old people where they were going with "that woman." The old woman ordered the young one to get out, when the young one said to the man, "You have no business to stop me and my things." The man then took the young woman by the hair of her head, and dragged her out of the cart. They left together, going up the street towards Cocke's, and quarrelling as they went; witness and her mother following just behind. The man told the woman, *en route*, that no man but himself should ever live with her, — that he would kill her first. The woman replied that she was not his wife, and that he had no claims on her. To this the man replied, "I am more than a husband to you." Here the man and woman stopped a moment under a tree, which stood near the street, and in the corner of Cocke's property. Witness and her mother passed the parties here, and just after passing them, met the deceased, who was going southward, in a direction opposite to that pursued by witness. As deceased was passing the two, the man said, "Is that you, Pancho? Here I have you where I want you;" and ran up to him and stabbed him. The deceased said nothing, was unarmed, and offered no resistance. When the man started towards the deceased, the woman exclaimed, "Look out, Pancho, he's got a knife!" As soon as the deceased was stabbed, he ran, and the appellant followed him. They ran across Laredo Street into the next street, and there the deceased fell dead, at Geneveva Rodriguez's gate. Witness and the others followed, getting to the gate immediately

after the deceased fell, and seeing him fall. The man was very close after the deceased when the latter fell. The stabbing occurred between seven and eight o'clock at night; the moon was shining very brightly. The knife — whether a butcher or pocket-knife, witness could not say — entered the chest, near the collar-bone. Pancho and Francisco are the same name.

On cross-examination, the witness states that she did not know the man who pulled the woman out of the cart, but when the woman was talking to him, heard her call him Bejarano. An old man, an old woman, and the woman who was pulled out of the cart were the parties together when the man came out of the chapparal. Witness was some eight or ten yards distant from the man and woman when she heard them talking; they walked on before the witness and her mother while they talked. Witness and her mother had passed them at the tree, and were some ten or twelve yards distant when the killing took place. Witness saw the man have a knife in his hand when he pulled the woman out of the cart, and when he stabbed the deceased. The deceased was a small, slender boy, eighteen or nineteen years old.

Witness testified before the coroner's inquest, and said then what she says now. Witness said then that she saw the man strike the deceased; and stated also that the man said to the woman that he would kill her before she should live with any other man, and that he was more than a husband to her. Witness did not read over her testimony before the coroner's inquest; but it was read to her, she thinks, and was signed by her. Witness's mother was with her all the time, and heard all that was said and saw all that was done. Witness did not know the man who did the killing, and would not now recognize him. The woman, in talking to him, called him Bejarano. The conversation between the man and woman was conducted in Spanish, both parties being Mexicans. Witness speaks Spanish as well as English, and her mother is a Spanish lady.

After the deceased was stabbed, he ran, perhaps, two hundred and fifty yards before falling. The man ran after him, and the crowd followed close behind. Witness heard the man who stabbed the deceased say, after deceased fell, " That is the way I like to see you ; I am the man who did it ; here, take me if you want to." Geneveva Rodriguez, at whose gate the deceased fell, told the man to go on away, and he left, going southward down the street. On redirect examination, witness says the man spoke defiantly when he said, " I am the man who did it," etc.

Tiburcio Leal, the second witness for the State, testified that he knew both appellant and deceased, but was not present at the killing. He lived on Laredo Street, about two hundred yards from the property of Cocke and Mrs. Haffner, and on the opposite side. The defendant passed witness's house soon after the difficulty occurred. Witness was sitting out in front of his house when the difficulty occurred. He heard a noise above his house which sounded like a fight, or difficulty of some kind, was in progress. Heard a woman's voice say, " Look out ; he's got a knife ! " Then heard a noise as of some one running from Laredo Street to the next street west. Witness then went to the west end of his lot, which fronts on the street west of Laredo Street, and when he got there, saw two men running, one after the other. The foremost man fell at the gate of Geneveva Rodriguez, who lived a little north from witness, and on the opposite side of the street. Did not then recognize either of the men. In a few minutes after the party fell at the gate, the defendant passed witness very near, and said, " I am the man that killed him ; here I am ; arrest me, if you want to do so." He spoke as if he was afraid of no one ; and presently added, " I do not allow any son of a b——h to insult me ! " Deceased only had one wound,—on the neck, near the collar-bone,—and was Francisco Montero. The wound was small, and appeared to have been inflicted with a small knife. All the conversation related was in Spanish, the witness's mother-tongue.

On cross-examination, witness states that the first time he saw defendant that evening was when he passed him after the deceased fell at the gate. Defendant passed witness walking leisurely, and seeming in no great hurry. He did not address his remarks to witness specially, but seemed to be talking to the assembled crowd, composed of some eight or ten persons, standing mostly around Geneveva Rodriguez's house. Witness did not know who the two men were when he saw them running towards the gate spoken of. Had known the defendant some two years before the killing, and believes that he had sustained the reputation of being a quiet, peaceable, and orderly man; at least, had never heard any thing to the contrary. When he passed witness, talking as stated, he gave no reason for his action, but looked as though he may have been drinking some.

Geneveva Rodriguez, being next sworn for the State, testified that she knew the deceased, but did not know the defendant. Recollects the evening of the killing. Deceased came running up from Laredo Street, by Judge Devine's lot, and stopped near witness's gate. Witness ran to the gate, and asked him what was the matter, and then noticed that he was followed by a short, thick-set man, who, when he had come up to where deceased had fallen, said, "I am the man that done it; arrest me." Witness was very much frightened. The short, thick-set man, whom witness does not remember to have seen before, and whom she could not now recognize, started off down the street, after making the statement just repeated. About one-half the body of deceased fell inside the gate, the other half outside. When witness asked deceased what was the matter, he answered, "A man has offended me." There was little blood on deceased, and witness could see that it was Montero, when he fell.

On cross-examination, witness stated that deceased did not say who the man was, but only that a man had offended him. Witness did not ask deceased if he had had a quar-

rel, nor did he say that he had had one. The short, thick-set man did not say when he came up, that he had offended deceased. Said no more than " I am the man who done it ; arrest me." Tiburcio Leal lives south of witness, and across the street. Witness did not see him there that night. He may have been there, but witness did not notice him in the crowd. The short, thick-set man spoke loud. Witness did not hear him say, " I am the man that killed him ; arrest me ; " which, if he had said it, witness would have heard. Did not hear him say, " I am the man that killed him. I don't allow any son of a b——h to insult me ; " and would have heard it if such expression had been used. When the man came up, he was running and excited. There was a small crowd gathered around the house after deceased fell, and the first to come up was a small, dark-looking young woman. The remarks were made to witness before the crowd came up, and witness thinks no one was present except her husband. The young, dark-looking woman was a Mexican. Tiburcio Leal's lot is a little below, and on the opposite side of the street from that of witness.

Joe Sheeley, for the State, testified that he is a deputy-sheriff of Bexar County. His father is an American, and his mother is a Mexican. Witness fully understands the Mexican language. *Offendido* means " offended ; " an injury either external or internal, and is not infrequently used to denote a wounding.

J. M. Penaloza, the next witness introduced by the State, testified that, the day after the killing of deceased, a warrant for the arrest of defendant was sent to the witness at his house, he having been deputized to effect the arrest. The killing occurred on June 10th, and witness arrested defendant on August 28th, following. Witness had some correspondence with defendant between the date of the killing and the arrest, but not in answer to any message which witness had sent him. The correspondence spoken of was a letter from defendant to Maria Cassiano, sent to witness's

care.  Witness delivered the letter to her, and, at her request, opened and read the letter to her.  She left the letter with witness, asking him to answer it, as she could not write ; which witness consented to do at some future time. After she left, witness sent the letter to Mayor French, and also sent for detective Phil. Shardein, who agreed with witness upon the letter they should write in reply.   After writing this letter, defendant came to San Antonio, and the first time that witness saw him was in the chapparal near Laredo Street.   Witness there had a conversation with defendant before he arrested him, and before defendant knew he was an officer.   This was about two o'clock on the morning of the 28th of August, 1878.  Witness found defendant by following E. Cassiano, the son of Maria Cassiano, who was taking a mare to the defendant from witness's lot, where he had left her tied the evening before.   When witness found the defendant, Maria Cassiano and several of her family were there, — Rosario Valdez and others.   Witness shook hands with the defendant, and talked to him for a half or three-quarters of an hour.   Defendant told witness that he had been working for an old German at Quihi ; also, that he had made a narrow escape from Mariano Garcia at Castroville, whom he saw coming up the street, when he ran, turned down a different street, went by the post-office, jumped into a lot, and made his escape.   Defendant said that he was then badly scared, but not so much frightened as on another occasion, two days after he killed the deceased. He said that he was then in the corn-field of old man Ripp, on the Alazan Creek, when he saw the officers coming towards him, and in a manner so direct that he could not see how he was to escape them.   He lay down close on the ground, stretched out, and stayed there until night, when he gathered and ate some raw corn, and left for Quihi.   Defendant also told witness that the man for whom he worked owed him $10, which he directed witness to collect and pay over to Maria Cassiano ; and that he was going to leave the

country, himself, forever; that he was then leaving for good, and was tired of dodging. Witness then told defendant that he had a warrant for his arrest, and called on him to surrender; which he did. Defendant did not know that witness was an officer, and intended to arrest him, witness having been careful to prevent such discovery.

On cross-examination, witness states that he said nothing to defendant to induce him to relate the circumstances narrated. Maria Cassiano was the only one present during the conference of witness with defendant, the others having left. When defendant told his experiences, as related, witness had him in his power; or, at least, considered that he had him in his power from the time he first approached him, but said nothing about it. In this conversation, defendant did not say that he wanted to give himself up, or any thing of that kind; but, on the contrary, said that he was then going to leave the country for good, and that he was tired of dodging. Witness did not ask defendant what brought him back.

Witness got two letters from defendant between the dates of the killing and arrest, both of which were addressed to Maria Cassiano, through witness's care. Witness sent the two letters to Mayor French. The first letter stated that he was travelling, and the last, that he was at Castroville. In neither of these letters did he make inquiry of how things were getting along. Witness made no promise at any time to get the defendant a lawyer. Witness understands that there was a reward offered for the defendant, to be paid upon his conviction; and supposes that he would get this reward in the event of conviction, and does not think he would get any thing if defendant should be acquitted. The $400 would have no influence upon the testimony of witness.

Here the State closed.

Rosario Valdez, for the defence, testified to having known the defendant five years, and the deceased about twenty

days before he was killed. On the day before the killing, Sunday, witness was at defendant's house. After witness left, or about eight o'clock, A. M., witness saw the deceased go into defendant's house. Maria Cassiano, Crecencia Garcia, the deceased, and the defendant were singing, and playing on a guitar. Witness saw the deceased at defendant's house three or four times in all, but did not see them together after Sunday, the day before the killing. They were then friendly, and parted very friendly. Deceased left alone, on the Sunday evening, after they got through the singing. Defendant is a quiet, peaceable, unoffending man, and was not in the habit of carrying arms. He had a small pocket-knife which witness had given him, and which he used to cut guitar-strings, the blade of which was about two inches long. Witness had never known him to carry any other weapon. The knife exhibited is the one given defendant by witness.

Cross-examined, the witness said he did not know that the knife exhibited was the one with which the killing was done ; nor does he know how long the defendant and the deceased knew each other.

Maria Cassiano, for the defence, testified that defendant and deceased were both at her house on the Sunday before the killing, pretty much all day, singing, and playing upon the guitar ; and that they separated on the most friendly terms. If they met again before the killing, witness does not know it ; nor does she know how long they had been acquainted, but she had learned that they came from the same town in Mexico. Witness was present at the interview between Capt. Penaloza and defendant, in the chapparal. Witness told Penaloza that defendant wanted to see him, and he went to the defendant. Witness heard all that passed between them. Penaloza asked defendant what he was doing ; to which the defendant replied, "I have come to give myself up." He then asked Penaloza about the affair, and how every thing was. He did not tell Penaloza

that he had been working for a man at Quihi; he did not tell him that he had made a narrow escape at Castroville; said nothing about being more frightened, and lying down on the ground to elude the officers, in old man Ripp's field, two days after he killed the deceased; nor did he admit that he had killed the deceased at all. If he had made any of those statements, witness would have heard them, for she was present, and heard every word that passed between the two. She recollects nothing of the kind; nor does she believe any thing of the sort was said. Had never seen defendant carry any other weapon than the small knife he used to cut guitar-strings. Witness identifies the knife exhibited as the one he owned and used as stated. Defendant came home about eight o'clock on Tuesday morning, but left immediately, on being directed to go by witness, who had heard that he had killed Montero. Witness had not seen him since, until he was arrested.

On cross-examination, this witness says that defendant is not married, but lived at witness's house, where he has lived ever since witness had known him. Witness did not leave Capt. Penaloza and defendant in the chapparal, but all left there together, — witness going home, and Penaloza and defendant going to town. Witness knows Crecencia Garcia, who had been, previous to the killing, staying awhile at witness's house. She left on Monday evening before the killing, going off in a cart with an old man and an old woman. They went up Laredo Street, starting about seven o'clock. If there ever had been undue intimacy between defendant and Crecencia Garcia, witness did not know it. They were simply friends. Penaloza wrote to defendant for witness, at her request.

W. H. Huston, for the defence, testified that, at the time of the killing of Montero, he was a justice of the peace of Bexar County, and, as such, held an inquest over the body of the deceased, the day after he was killed. He reduced the testimony of the witnesses to writing, or such of it, at

least, as he thought was important. Ursula Castro was a witness before the inquest. It was witness's custom to read the testimony, as reduced to writing, to the witnesses before they signed it, and he presumes he did so in this instance. Ursula Castro signed her evidence as witness had written it down. She did not say at the inquest that she saw a man stab Montero with a knife. Witness is positive that she did not, as he asked her, he thinks, particularly, if she saw any one stab the deceased, and she answered that she did not. She did not say that she heard defendant say, "Is that you, Pancho? Here's where I want you."

Margarita Morain, for the defence, testified that she lived on Laredo Street at the time deceased was killed, and heard of the killing the next morning after it occurred. Had known the defendant for more than a year, and had known him as a peaceable, inoffensive man; had never heard a word to the contrary about him. Witness saw him on the Sunday evening before the killing. He passed witness's house on Monday evening about seven o'clock, quite drunk. Does not remember whether or not the night was dark.

Pablo Campos, for the defence, testified that he had known the defendant two years, as a quiet, peaceable, and orderly man. Witness saw him about one o'clock on the day of the killing, at which time he was drinking. Saw him again about seven o'clock the night of, and before, the killing, at which time he was walking with a small, dark woman, named Crecencia Garcia.

E. Jamboris, testifying for the defence, said that defendant had worked for him two years, and sustained the character of a peaceable, quiet man.

J. S. Coy, for the defence, testified that the wound in the neck of the deceased was very small, as if made with a very small knife. Had known defendant for three years, as a peaceable, quiet man.

The record manifests that an able defence was made in the court below by the counsel who represents the appellant in this court.

*P. H. Ward*, for the appellant. The court clearly erred in excusing Julius Oppenheimer, who was summoned on the special *venire* in this cause, before he was tested as to his qualifications as a juror. If a juror has any ground of exemption which would excuse him from serving on the jury, he has an opportunity to make it known in his *voir dire*, and the court cannot know judicially that any one summoned on a special *venire* is exempted from jury duty. *Robles* v. *The State*, 5 Texas Ct. App. 346.

The court erred in holding that J. H. Schaefer was a competent juror. On his *voir dire*, Schaefer said he was not a freeholder or a householder; that he did not rent a house, but that he and his family lived with his father, who controlled the house, and who could at any time turn him and his family out of doors. The mere fact that Schaefer furnished provisions to his father, as compensation for his living in the house, does not constitute him a householder under the law. He is only a boarder.

The court ought not to have admitted in evidence the statements made by the deceased to the witness Geneveva Rodriguez. Such statements were mere hearsay evidence, and were calculated to injure the defendant. The fact that the defendant — if it was the defendant — very soon afterwards came up to where the deceased was, does not render the statement the less hearsay evidence. The defendant was not present when the statement was made, and it is not contended that the statement was a dying declaration.

The court ought to have charged the law of manslaughter. The evidence of Leal, a witness for the State, shows that there was a fight; at least, he heard the noise of fighting, and immediately afterwards he saw two men running from the direction where he heard the noise of fighting. If the charge of manslaughter had been given, the jury could very reasonably have inferred that the fight was between the deceased and the defendant; and if there was a fight, the defendant is not guilty of murder, in the absence of other evidence showing the origin of the fight.

. The evidence shows that the meeting between deceased and defendant was purely accidental; that they had parted, the evening preceding the night of the difficulty, as very good friends, at the house of defendant, where they had been singing, and playing on a guitar. The jury should be allowed to pass upon that fact. In this connection, we must take into consideration the character of the weapon used.

"If in any case the facts proven create a doubt, however slight, that the case might be graded below murder, then the court should give the jury the opportunity to pass upon that doubt. In a doubtful case, the court must not solve the doubt resting on the facts; for if it does, and this court affirm the judgment of the lower court, that court and this will decide doubtful facts, and the right of trial by jury will be practically gone." *Halbert* v. *The State*, 3 Texas Ct. App. 661; *Robles* v. *The State*, 5 Texas Ct. App. 346.

*Thomas Ball*, Assistant Attorney-General, for the State.

ECTOR, P. J.   The defendant was indicted in the District Court of Bexar County, for the murder of Francisco Montero. He was convicted of murder in the second degree, and was adjudged to be imprisoned in the penitentiary for ninety-nine years. The defendant made a motion for new trial, and in arrest of judgment; both of which being overruled, he appealed the cause to this court, and has assigned the following errors, to wit: —

"1. The court erred in excusing the juror Julius Oppenheimer, before he was duly tested as to his qualifications as a juror.

"2. The court erred in ruling that J. H. Schaefer was a competent juror.

"3. The court erred in allowing the State's witness Geneveva Rodriguez to testify to what deceased said.

"4. The court erred in refusing the charge asked for by the defendant.

" 5. The court erred in overruling defendant's motion for a new trial.

" 6. The court erred in overruling the defendant's motion in arrest of judgment.

" 7. The court erred in not giving the law of manslaughter."

In responding to the errors assigned, we will do so in the order in which they are presented in the record.

1. It appears from the defendant's bill of exceptions (as qualified by the court) that the juror Julius Oppenheimer had previously been tested, under oath, as to his qualifications, and he declared he was not a citizen of the United States and of this State; and on the day of trial, when the special *venire* was called by the order of the court, and Julius Oppenheimer's name being called as a juror, he stated his disqualification, and was excused by the court without objection. Defendant's counsel insists that the court clearly erred in excusing this juror, who was on the special *venire*, before he was called and tested as to his qualifications as a juror, and cites us to the case of *Louis Robles* v. *The State*, 5 Texas Ct. App. 346, in support of his position. An examination of the two cases will show a marked difference between them. The proper course for the defendant, or his counsel, if they had any objection to the action of the court in excusing the juror, would have been to have made it known when Oppenheimer was called on the special *venire*. If, when Oppenheimer was before the court, counsel for the defendant had expressed a desire that the juror should be again sworn and tested as to his qualification, it is reasonable to conclude that his wishes in this respect would have been complied with; and that the court, although believing it an unnecessary consumption of time, would not have excused the juror, as was done.

2. The court did not err in holding that J. H. Schaefer was a competent juror. It appears from the defendant's second bill of exceptions that, on the trial of the case, J. H.

Schaefer, one of the jurors summoned on the special *venire,* on his examination before the court to ascertain whether he was a competent juror, said that he was not a householder; that he was a married man, with a family, and that he and his family lived with his father, at his father's house; and that, as a compensation for so living with his father, he furnished provisions for the entire family, including his father; that the house belonged to his father, and was under his father's control, and that his father could turn him out at any time. The defendant objected to the ruling of the court in holding said Schaefer a competent juror, and tendered a bill of exceptions, and also challenged the juror peremptorily. The court, before signing the bill, added the following: " The truth of the matter is, the father, Schaefer, although the owner of the house in which the juror lived, did not keep house, but he lived with his son, the juror in question. The whole question arose from a subterfuge on the part of the juror to get excused; but the result of the inquiry disclosed the fact that he was the head of a family, kept house, furnished the supplies for himself and family, and his father lived with him. Furthermore, that defendant had an abundance of challenges left when the jury was formed."

If we were to admit that the court erred in holding Schaefer a competent juror, yet such ruling, in view of the facts, occasioned no injury to defendant; and, consequently, would furnish him no ground for the reversal of the judgment. The legitimate inference would be that, without exhausting his peremptory challenges, the defendant obtained a jury possessed of all the qualifications prescribed by law, with each of whom he was well satisfied, and to whom he was willing to submit the determination of his guilt or innocence. *Johnson* v. *The State,* 27 Texas, 765; *Burrell* v. *The State,* 18 Texas, 713; *McGowan* v. *The State,* 9 Yerg. 184.

There was manifestly no error in allowing the State's

witness Geneveva Rodriguez to testify to what the deceased said, which evidence was objected to by the defendant on the ground that it was hearsay, and a mere recital of a past event. The accused was present when the declaration which was objected to was made. For a proper understanding of this question, we will give a portion of the testimony, as we find it in the transcript before us.

Ursula Castro, the first witness introduced by the State, testified as follows : " On the night of June 10th last, I had been down to see my mother. Between seven and eight o'clock I started home, my mother accompanying me. When we reached the Rodriguez place, about three hundred yards below the property of Mr. Cocke and Mrs. Haffner, where the killing occurred, we saw an old man driving a cart, on which was an old and a young woman. I saw a stout, short man come out from the chapparal and stop the cart. He asked the old people where they were going with that woman; and was mad. The old woman told the young one to get out of the cart. The young woman said to the man, ' You have no business to stop me, with my things.' The man then went up to her, took her by the hair of the head, and pulled her from the cart. They left the cart, and went on up the street, quarrelling, as far as Cocke's place. Myself and mother were walking just behind them. He told the woman that no man but himself should ever live with her, — that he would kill her first. She replied that she was not his wife, and he had no claims on her. He replied, ' I am more than a husband to you.' The man and woman here stopped a moment under the shade of a tree which stood right near the street.  *  *  *  My mother and myself passed them there, and just after passing them we met the deceased, Francisco Montero. He was going southward, and we were going northward. As Montero was passing the man and woman, the man said, ' Is that you, Pancho? Here I have you where I want you ; ' then ran up to him and stabbed

him.   The deceased said nothing; he was unarmed, and offered no resistance.   The woman halloed, 'Look out, Pancho ; he's got a knife !'   As soon as deceased was stabbed, he started to run, and the defendant ran after him.   They ran across Laredo Street, and on to the next street, where Montero fell dead, at the gate of Geneveva Rodriguez.   *   *   *   I saw him when he fell; the man was right close after him.   The knife entered his right side, in the chest, near the collar-bone.   *   *   *   The moon shone brightly.   Pancho and Francisco is the same name.   *   *   *   After the deceased was stabbed, he ran, I suppose, about two hundred and fifty yards before falling.   I did not know the man who did the killing, and would not now recognize him.   The woman, in talking to him, called him Bejarano.   The conversation between the woman and man was in Spanish.   They were Mexicans.   I speak Spanish as well as I do English, — a little better, I think.   My mother is a Spanish lady.   I heard the man who did the stabbing say, after Montero fell, 'That is the way I like to see you.   I am the man that did it; here I am ; take me, if you want to.' "

Geneveva Rodriguez, a witness also in behalf of the State, testified : " I knew Francisco Montero.   He is dead.   I do not know the defendant.   The deceased came running from Laredo Street, by Judge Devine's lot, and stopped near my gate.   I ran to the gate, and asked him what was the matter.   Just following him was a stout, thick man. This man said, as he came up where Montero had fallen, at my gate, 'I am the man that done it ; arrest me.'   *   *   * I do not know that I ever saw this short, thick man before, and could not recognize him.   *   *   *   When I asked the deceased what was the matter, he replied, 'A man has offended me.' "   (This was the portion of the testimony that was objected to by the defendant as being hearsay, and a mere recital of a past event ; and " offended," as here used, in the Mexican language, was afterwards proved to mean " injure," or " stab.")

Tiburcio Leal, also a witness for the State, testified as follows: "I know José Bejarano, and knew the deceased. I was not present at the time of the difficulty. The defendant there passed by my gate soon after the difficulty occurred. My house is on Laredo Street, about two hundred yards below the property of Mr. Cocke and Mrs. Haffner, and on the opposite side of the street from theirs. I was sitting in front of my house on the night of the 10th of June, near Laredo Street, when I heard a noise above me like there was a fight or difficulty. I heard a woman's voice say, 'Look out; he's got a knife!' I then heard a noise as if running from Laredo Street to the next street west. I then went to the west end of my lot, which fronts on the main street west of Laredo Street, and when I got there I saw two men running, one after the other. The foremost man fell at the gate of Geneveva Rodriguez, who lives a little north of me, and on the opposite side of the street. I did not then recognize either of the parties. In a few minutes after the party fell at the gate, the defendant passed right near me, and said, 'I am the man that killed him; here I am; arrest me if you want to do so.' "

The court below properly permitted the witness Geneveva Rodriguez to give the reply of the deceased, when asked "what was the matter?" It was admissible as a part of the *res gestæ*. *Boothe* v. *The State*, 4 Texas Ct. App. 202.

After the court had submitted its charge to the jury, the defendant asked four additional instructions. Three of them were given, and the fourth refused by the court. The one which the court declined to give is as follows: "If an injury be inflicted in a cruel manner, though with an instrument not likely, under ordinary circumstances, to produce death, the killing will be manslaughter, or murder, according to the facts of the case."

While the last instruction asked by the defendant's counsel is correct as an abstract legal proposition, it was not applicable to any phase of the case as presented by the evi-

dence.    An instruction asked which is inapplicable should be refused, however correct it may be as an independent proposition.

The only grounds set out in defendant's motion for new trial have already been considered and passed upon in this opinion.

The objection respecting the term of the court at which defendant was tried and convicted, which is presented in defendant's motion in arrest of judgment, is not well taken. The same question has been decided by this court, during its present term, in the case of *Cordova et al.* v. *The State, ante,* p. 207.    See the opinion of the court in that case.

There was no evidence before the jury which required the court to instruct them as to the circumstances which will reduce homicide from murder to manslaughter.    It has often been held, both by our Supreme Court and this court, that it is only necessary to give such instructions as are applicable to every legitimate deduction which the jury may draw from the facts.    If the deceased was killed by the accused, which was not controverted, the case was murder in the first degree or murder in the second degree.

And the fact that the evidence shows the deceased and the accused passed a portion of the night preceding the night of the killing, as friends, at the house of the defendant, singing and playing the guitar together, and separated on friendly terms, would not in the least mitigate or excuse the homicide.    What wicked passion prompted the defendant to commit the homicide we are left to conjecture.    The duration of the punishment assessed by the jury would not warrant us in disturbing the judgment, for it is supported by the law and the evidence.

Before passing from the case, we cannot too highly commend the judge who presided at the trial for the explanations made by him as to the facts and the reasons for his rulings on several of the points presented in the defendant's bills of exception.    By this course an appellate tribunal

is often materially aided, and gets a true insight into the proceedings on the trial better than by any other method. There is no error in the judgment, and it is, therefore, affirmed.

*Affirmed.*